# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA,
ACTING BY ATTORNEY GENERAL
JOSH SHAPIRO,

                    Plaintiff,

      v.

HARBOUR PORTFOLIO CAPITAL, LLC,
HARBOUR PORTFOLIO GP, LP,
HARBOUR PORTFOLIO VI, L.P.,
HARBOUR PORTFOLIO VII, L.P.,
HARBOUR PORTFOLIO VIII, L.P.,
HARBOUR PORTFOLIO ADVISORS LLC,
AND CHARLES A. VOSE III,

                  Defendants.

CIVIL DIVISION

GD-18-9176

No.

**COMPLAINT**

Code: 020-Equity

Filed on Behalf of Plaintiff:

COMMONWEALTH OF
PENNSYLVANIA, OFFICE OF
ATTORNEY GENERAL

Counsel of Record for this Party:

Susan A. Apel
Senior Deputy Attorney General
P.A. I.D. No. 50597
Office of Attorney General
Bureau of Consumer Protection
1251 Waterfront Place, Mezzanine
Pittsburgh, PA 15222
(412) 565-2578

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, ACTING BY ATTORNEY GENERAL JOSH SHAPIRO, | : : : : | CIVIL DIVISION |
| Plaintiff, | : : | No. |
| v. | : : | COMPLAINT |
| HARBOUR PORTFOLIO CAPITAL, LLC, HARBOUR PORTFOLIO GP, LP, HARBOUR PORTFOLIO VI, L.P., HARBOUR PORTFOLIO VII, L.P., HARBOUR PORTFOLIO VIII, L.P., HARBOUR PORTFOLIO ADVISORS LLC, AND CHARLES A. VOSE III, | : : : : : : : | Code: 020-Equity |
| Defendants. | : | |

## NOTICE

**YOU HAVE BEEN SUED IN COURT. IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS AFTER THIS COMPLAINT AND NOTICE ARE SERVED, BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU. YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED**

BY THE PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER

RIGHTS IMPORTANT TO YOU.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF

YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET

FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION

ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY

BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES

THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A

REDUCED FEE OR NO FEE:

ALLEGHENY COUNTY BAR ASSOCIATION
LAWYER REFERRAL SERVICE
11TH FLOOR KOPPERS BUILDING
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
412-261-5555

Susan A. Apel
Senior Deputy Attorney General
Attorney No. 50597
Office of Attorney General
Bureau of Consumer Protection
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
Telephone: 412-565-2578

Attorney for Plaintiff

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA ACTING BY ATTORNEY GENERAL JOSH SHAPIRO | : : : : |
| Plaintiff, | : : |
| v. | : : |
| HARBOUR PORTFOLIO CAPITAL, LLC, HARBOUR PORTFOLIO GP, LP, HARBOUR PORTFOLIO VI, L.P., HARBOUR PORTFOLIO VII, L.P., HARBOUR PORTFOLIO VIII, L.P., HARBOUR PORTFOLIO ADVISORS LLC, AND CHARLES A. VOSE III, | : : : : |
| Defendants. | : : : |

## COMPLAINT

**AND NOW**, comes the Commonwealth of Pennsylvania, by Attorney General Josh Shapiro, through the Bureau of Consumer Protection ("Commonwealth" or "Plaintiff"), to seek civil penalties, restitution, injunctive and other relief for Defendants' deceptive and unfair conduct in connection with the most sacrosanct of American dreams:  home ownership.

Defendants unfairly and deceptively lured Pennsylvania citizens into entering into land contracts for the purchase of family homes, under usurious interest rates and based upon implicit and explicit misrepresentations about the nature and terms of the transactions as well as the condition of the homes.

## STATUTORY BACKGROUND

1.     The Commonwealth brings this action pursuant to (i) the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. ("Consumer Protection Law"), to restrain unfair or deceptive acts or practices in the conduct of trade or commerce declared unlawful by Section 201-3 of the Consumer Protection Law, and (ii) the Loan Interest and Protection Law, Act of January 30, 1974 (P.L. 13, No. 6), as amended (the "Loan Interest and Protection Law"), to restrain and provide redress for violation of such law.   Defendants' actions are also in violation of (i) the Mortgage Licensing Act, 7 Pa.C.S. Section 6101 *et. seq*. (the "Mortgage Licensing Act"), (ii) the Installment Land Contract Law, 68 P.S. Section 901 *et. seq*. (the "Installment Land Contract Law"), and (iii) the Real Estate Seller Disclosure Law, 68 Pa C.S. Section 7301-7314 (the "Real Estate Seller Disclosure Law").

2.     The Consumer Protection Law authorizes the Attorney General to bring an action in the name of the Commonwealth when the Commonwealth has reason to believe that Defendants used methods, acts or practices declared unlawful by Section 201-3 of the Consumer Protection Law and that citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of are enjoined.

3.     Furthermore, Defendants charged interest rates that are approximately double the maximum rate allowed by the Loan Interest and Protection Law and otherwise violated the Loan Interest and Protection Law.  The Attorney General is also authorized to bring an action to address such violations.

4.     The Commonwealth believes that the public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts and practices of the Defendants, and civil penalties and restitution as hereinafter set forth.

In support of this action, the Commonwealth respectfully represents the following:

## JURISDICTION

5.    This Court has original jurisdiction over this action pursuant to Section 931 of the Judicial Code, 42 Pa.C.S.A. § 931(a).

## VENUE

6.    Venue lies with this Court pursuant to Pa.R.C.P. 1006(a)(1).

## THE PARTIES

7.    The Plaintiff is the Commonwealth of Pennsylvania, by Attorney General Josh Shapiro, through the Bureau of Consumer Protection, with offices located at 1251 Waterfront Place, Mezzanine Level, Pittsburgh, Pennsylvania 15222.

8.    Defendant Harbour Portfolio VI, L.P. ("Harbour VI") is a Texas limited partnership formed in 2010 that owns or has owned real estate in Pennsylvania and engages or has engaged in the business of contract for deed lending with respect to such real estate.  Harbour Portfolio VI's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

9.    Defendant Harbour Portfolio VII, L.P. ("Harbour VII") is a Texas limited partnership formed in 2011 that owns or has owned real estate in Pennsylvania and engages or has engaged in the business of contract for deed lending with respect to such real estate.  Harbour VII's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

10.    Defendant Harbour Portfolio VIII, L.P. ("Harbour VIII") is a Texas limited partnership formed in 2013 that owns or has owned real estate in Pennsylvania and engages or has engaged in the business of contract for deed lending with respect to such real estate.  Harbour VIII's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

11.     Harbour Portfolio GP, LP is a Texas limited partnership formed in 2010 that is the general partner of Harbour VI, Harbour VII, and Harbour VIII. Harbour Portfolio GP LP's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

12.     Defendant Harbour Portfolio Advisors LLC is a Texas limited liability company formed in 2010 that is the direct or indirect manager of Harbour VI, VII and VIII, and in that capacity engages or has engaged in the business of contract for deed lending with respect to real estate owned by such entities. Harbour Portfolio Advisors LLC's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

13.     Defendant Harbour Portfolio Capital, LLC is a Texas limited liability company formed in 2010 that is the direct or indirect manager of Harbour VI, VII and VIII, and in that capacity engages or has engaged in the business of contract for deed lending with respect to real estate owned by such entities. Harbour Portfolio Capital LLC's principal address is 8214 Westchester Drive, Suite 635, Dallas, Texas 75225.

14.     Defendant Charles A. Vose III ("Vose") is an individual resident of Dallas, Texas, who conceived of, orchestrated and directed the deceptive and unfair behavior described in this Complaint. Vose is a manager of Harbour Portfolio Advisors LLC and owns in whole or in part and/or controls the other Defendants.

15.     Vose is the direct or indirect manager of each other Defendant, is the founder of the enterprise operated by Defendants, and has substantial control and responsibility over the operations of the Defendants.

16.     Vose directed, supervised, approved, formulated, authorized, ratified, benefited from and otherwise participated in the acts and practices alleged herein.

17.     Defendants acted in concert with one another.

4

18.     Unless otherwise specified, whenever reference is made in this complaint to any act of any of the Defendants, or any employee and/or an agent of the Defendants, such allegations shall be deemed to mean the act of the Defendants individually, jointly or severally.

## FACTUAL BACKGROUND

19.     In response to the mortgage crisis, Vose formed several investment funds (e.g., Harbour VI, Harbour VII and Harbour VIII), beginning in 2010, to bid on bulk sales of thousands of foreclosed single family homes located across the United States and owned primarily by mortgage finance giant Fannie Mae.   Defendants submitted bids for pools containing very large numbers of foreclosed homes.

20.     Defendants also purchased homes from other sellers, including Freddie Mac.

21.     In this manner, Defendants purchased over 6,000 single family homes nationwide, over 100 of them in Pennsylvania.  The vast majority of these single family homes were low-cost homes in disadvantaged or rural neighborhoods, even prior to foreclosure.  The price paid by Defendants for the homes purchased in Pennsylvania was approximately $4,000 to approximately $15,000.

22.     Many of the homes purchased by Defendants were re-sold pursuant to an installment land contract that they labeled "Agreements for Deed," "Contract for Deed," or "Installment Land Contract" (generically referred to herein individually as a "Land Contract" or collectively as "Land Contracts"), in approximately 2010 through at least 2016.   In this manner Defendants re-sold at least 70 homes in Pennsylvania under Land Contracts pursuant to which the buyers were contractually committed to repay at least a total of $2,600,000 and interest thereon at nine and nine-tenths percent per annum (9.9%).

23.     Throughout the relevant time period, National Asset Advisors, LLC ("NAA") and/or National Asset Mortgage, LLC ("NAM"), limited liability companies formed under the laws of South Carolina, each of which have an address at 4350 St. Andrews Road Suite F, Columbia, SC 29210 (together, the "Defendants' Agents") were contracted by Defendants to act as the agents for Defendants in executing many of the Land Contract transactions and servicing the Land Contracts.

## A Process for Enticing First-time Homeowners

24.     The citizens who purchased homes from Defendants in Pennsylvania ("Harbour Victims") were typically first-time homebuyers and persons of low or below average income.

25.     Defendants created a process for enticing the Harbour Victims into entering into Land Contracts with them.  The process began by first putting up a "for sale by owner" type sign in the yard of the home, typically stating "Buy this house for $XXX per month and $XXXX down."

26.     Defendants put a combination lock on the door.  Interested buyers called the number on the sign, provided background information about themselves, and were given the combination to walk through the house.

27.     The homes were generally in poor condition and vacant.  Typically the electricity, gas and/or water were disconnected at the time of the walk-through, which often masked serious defects.  Many lacked appliances, and some or all of the copper pipes were frequently removed.

28.     A buyer who wished to purchase the home in question was instructed to call back and indicate his or her interest.  At this point, the basic terms – the total purchase price, monthly payment amount, and interest rate would be discussed.   The buyer would then in most cases be required by Defendants to pay a **non-refundable** deposit in an amount from 2% to 5% of the total price of the home as a precondition to moving forward with the transaction.

6

29.     The potential buyer would at least sometimes be told, prior to providing the non-refundable deposit, that the sale of the home will be structured as a "land contract," but no further information regarding any defects in the property, the price Defendants paid for it, or the unusual nature of the Land Contract transaction would be disclosed at this or any other time by Defendants. In particular, Harbour Victims typically were not provided the Land Contract transaction documents before paying the non-refundable deposit.

30.     The purchase price of the homes was set by Defendants with little or no negotiation and ranged in Pennsylvania (during the 2010 to 2016 period) from approximately $16,000 to approximately $62,000.

31.     Prices charged by Defendants for a home in Pennsylvania were frequently 3x to 4x the price that Defendants paid to Fannie Mae for that property just days or months before, up to in at least in one instance over 10x the price that Defendants paid.  In other words, Defendants frequently sold the homes for 300% to 400% (or in at least one case up to 1000%) more than Defendants had paid for them just days or months earlier.

32.     Defendants typically made no improvements to or investments in the properties purchased from Fannie Mae or Freddie Mac before selling them to Harbour Victims.

33.     Typically the interest rate set by Defendants on Land Contracts was nine and 9/10 percent per annum (9.9%).

34.     After the interested buyer paid the non-refundable deposit, Defendants mailed or caused to be mailed to the potential Harbour Victim a package of closing documents, mostly boilerplate documents typical of conventional mortgage transactions, for the potential Harbour Victim to sign, notarize and return.   See Exhibit A, which is attached and incorporated herein, for an example of a Harbour closing document package used in Pennsylvania in redacted form.

7

35.     Although not shown in Exhibit A, on the top of the closing package was a letter beginning with the sentence "Congratulations on your decision to buy a home!"

36.     As is evident upon a review of Exhibit A, the remainder of the package closely resembled a typical package of closing documents utilized for a conventional home mortgage transaction, particularly to the untrained eyes of the first-time homebuyer Harbour Victims.

37.     The package included primarily a Land Contract, a Purchase Money Note, Truth in Lending Disclosure Statement, Owner Occupant Certification, Equal Credit Opportunity Act statement, Fair Credit Reporting Act statement, Good Faith Estimate, Purchasers' Certification and Authorization, mold disclosure, lead paint rider, and HUD settlement sheet.

38.     The closing documents contain numerous misrepresentations, both implicit and explicit, as set forth below by way of example.

39.     The HUD settlement statement is exactly the same HUD National Mortgage Licensing Center form that is used for a conventional mortgage.  The line items utilized by Defendants include line 204, called "Owner Financed Mortgage," falsely and misleadingly suggesting a mortgage transaction.

40.     The Good Faith Estimate is exactly the same Good Faith Estimate National Mortgage Licensing Center form that would be used for a conventional mortgage.

41.     Paragraph 1 of the Purchasers' Certification and Authorization set forth at Exhibit A asks Harbour Victims to agree that they have "applied to purchase a house with financing from Harbour Portfolio VIII, L.P.", and that they have "completed an application containing various information on the purpose of the mortgage . ."  Harbour Victims are also asked to state that "We made no misrepresentations in the mortgage application or other documents. . ."  That one page document goes on to refer to "mortgage" three additional times.

42.     It is likely that the language of the Purchasers' Certification and Authorization would be confusing to any person asked to read and sign it, and cause such person to misunderstand the transaction contemplated thereby to be a conventional mortgage transaction when in reality it is not a conventional mortgage transaction but is instead an unusual and much less favorable (from the point of view of the buyer) transaction.

43.     The Equal Credit Opportunity Act Statement and the Fair Credit Reporting Act Statement are exactly the same National Mortgage Licensing Center forms that would be used for a conventional mortgage.

44.     The Truth in Lending Disclosure Statement is exactly the same National Mortgage Licensing Center form that is used in conventional mortgage transactions and includes a disclosure that "Someone buying your house may not assume the remainder of your purchase on the original terms."

45.     This disclosure language in the Truth in Lending Disclosure Statement falsely and misleadingly implies that the house is actually deeded in the name of the Harbour Victim and that the Harbour Victim would have the right to sell their house, resulting in confusion and misunderstanding by the Harbour Victim.   In reality, the Harbour Victim was not receiving any title to the house in question.

46.     The Owner Occupant Certification form (also from the National Mortgage Licensing Center) requires the Harbour Victim to certify that "I am purchasing the above-referenced property as my primary residence . . ." and that "I further certify that I will not sell or rent the property within twelve (12) months of the Closing." This language is likely to further cause confusion and misunderstanding and lull any Harbour Victim into the false belief that he or

she actually is being conveyed outright a title to the residence.

## The Unfair Terms of the Land Contract and Purchase Money Note

47.   The Land Contract, buried in the package of conventional mortgage documents presented to the Harbour Victims for signature, was the unusual and treacherous part of the package. The Land Contracts used by Defendants in Pennsylvania were in several different formats, although the Land Contract included in Exhibit A is very typical.

48.   The average Harbour Victim did not have sufficient personal experience to understand or distinguish a conventional mortgage from the significantly different and less favorable terms of the Land Contract, particularly when the Land Contract was buried in a stack of otherwise conventional mortgage documents, as described above.

49.   The Land Contract provided for conveyance of the deed only after payment in full during the decades-long term, although this important provision regarding timing of the deed conveyance is not provided anywhere else in the closing document package, and one has to search hard for this provision in the Land Contract.

50.   In fact, the Land Contract attached at Exhibit A states at the beginning of Paragraph 1 that Seller "hereby covenants and agrees to convey" fee simple in the house to the Harbour Victim, suggesting that conveyance is immediate.  It is only if one looks at the preceding sentence that is not included in Paragraph 1 that the important proviso "if Purchaser shall first make the payments and perform the covenants hereafter described:" appears.

51.   Pursuant to the Land Contract, the total purchase price was to be paid in accordance with the terms of a "Purchase Money Note, . . . of the same date," with interest at the rate of (typically) 9.9% per annum.  The total purchase price would be amortized over a period of

time (typically 30 years but sometimes a shorter period), with a specified fixed monthly payment amount (which included principal and interest).

52.     Purchaser was also required pursuant to the Land Contract to insure the property and pay all taxes, and typically the amount due each month also included an amount to be paid into escrow for taxes and insurance.

53.     The Land Contract provided that the property would be conveyed "as is" and that purchaser was solely responsible for bringing the building and premises to a habitable condition within a stated number of months, and for maintaining the property in good state of repair during the term of the Land Contract.

54.     As noted above, in conjunction with the Land Contract, Harbour Victims were asked by Defendants to sign a "Purchase Money Note" pursuant to which the Harbour Victim agrees to pay a principal sum equal to the total purchase price (the same purchase price set forth in the Land Contract), plus interest at the rate of 9.9% of the principal amount per annum.

55.     The Purchase Money Note provides that if the Harbour Victim fails to make the payment or any part thereof, at the time when due, then the entire unpaid principal balance (the entire purchase price of the home) plus interest shall, at the option of Defendants, at once become due and payable.

56.     The Land Contract provides that in the case of failure of the Harbour Victim to make a payment, in whole or in part, or to perform any of the covenants made and entered into, the Land Contract, at the option of the Defendants, may be terminated, and the Harbour Victim shall forfeit all payments made on the Land Contract **and all right to the property** (emphasis added), including the cost of any improvements or repairs made to the property.

11

57.   The Land Contract also provides for default if the Harbour Victim transfers any ownership interest in the Land Contract.

58.   As set forth in Exhibit A, in the event of a default, the Harbour Victim is entitled to no notice or cure rights in the Land Contract or the Purchase Money Note.   Pursuant to the terms of the Land Contract and Purchase Money Note, Defendants have the option to instantly and irreversibly terminate these contracts upon any default, large or small, without prior notice or the right to cure, and to declare the total principal balance of the purchase price of the property due and payable.

59.   The structure of the unlawful Land Contract transactions was designed by Defendants to give Defendants both the benefits of being a landlord and the benefits of being a conventional mortgage lender without any of the responsibilities of either, at the expense of the Harbour Victims.

60.   The deceptive and unfair Land Contracts gave Harbour Victims neither the advantages of being a tenant (e.g., the right to habitable conditions and maintenance at the landlord's expense) nor the recorded title, right to equity, and other legal protections and rights afforded in a conventional mortgage transaction.

**Material Information Was Not Disclosed**

61.   The potential Harbour Victim would, after receiving the packet of above-described documents, either (i) sign, have notarized, and return the package of closing documents, or (ii) lose his or her non-refundable deposit.

62.   The process developed by Defendants for luring Harbour Victims into closing Land Contract transactions obscured the true nature of the transaction and led Harbour Victims to the

mistaken understanding that the Land Contract transaction was similar in all material respects to a conventional mortgage.

63. Even if a Harbour Victim understood that he or she was entering into a Land Contract and not a conventional mortgage, Defendants provided no disclosures regarding the meaningful and detrimental differences between the two types of transactions. Having no expertise with respect to buying a home, Harbour Victims likely were confused by, and misunderstood, the packet of above-described documents and did not understand the significant negative differences between (i) receiving a seller general or special warranty deed and a mortgage in a conventional home purchase transaction and (ii) entering into a Land Contract.

64. Harbour Victims were not informed up front that title to the home that they had agreed to buy would not be deeded in their name upon signing the Land Contract transaction documents, as occurs with a conventional home purchase and mortgage.

65. Harbour Victims were not informed that the Land Contract transaction was lacking the protections associated with a conventional deed and mortgage, including an appraisal, notice and cure periods, title insurance, rights associated with the foreclosure process, and other protections.

66. Harbour Victims were not informed that they could make every single payment required under the Land Contract for 29 years and 11 months, and if that Victim did not make the last payment, he or she be declared in default, ejected, and have no right to the home or any equity in the home that he or she had lived in, maintained, paid the taxes on, and paid monthly installments to Defendants to buy, for almost 30 years.

67. Defendants did not clearly and conspicuously inform Harbour Victims that if they are ejected for any misstep during the 30 year period and – unlike in a conventional mortgage

transaction -- have no rights to the equity in his or her home, even if his or her investments of time and money into the home had doubled or tripled its value. The failure to inform likely led to confusion and misunderstanding about these negative aspects of the transaction.

68.     Defendants did not clearly and conspicuously inform any Harbour Victim that if he or she died before the end of the 30-year term, his or her decedents would have no right to any appreciation in the home, whether resulting from investments and improvements made by the deceased or otherwise. The failure to inform likely led to confusion and misunderstanding about these negative aspects of the transaction.

69.     Unlike conventional home mortgage lenders, Defendants did not suggest, require or provide an appraisal, home inspection, or title insurance in connection with Land Contract transactions, or provide any disclosure regarding the risks to Harbour Victims of not securing such items. The mostly first-time homebuyer Harbour Victims lacked the experience and knowledge to initiate an appraisal, title insurance or home inspection on their own.

**Failure to Comply with Local Law**

70.     Seller did not obtain occupancy permits or otherwise comply with local township or borough laws imposed upon sellers of single family homes. One version of Land Contract used by Defendants provides that the purchaser is solely responsible for obtaining any required occupancy permits.

71.     Thus, either Defendants ignored their obligations to comply with local law regarding inspections, or permits prior to sale of a home, or in certain cases Defendants sought to contractually shift those obligations to Harbour Victims, the vast majority of whom had never sold a home before and had no idea how to find out what such laws are, or navigate compliance with such laws.

**Charging Recording Fees and Failing to Record Was Misleading and Deceptive**

72.     Purchasers would also typically be charged certain fees and costs at "closing," including an "administrative fee" of several hundred dollars and sometimes "recording" costs or fees of $75 or $80.

73.     Notwithstanding that Harbour Victims were charged a "recording" fee or cost, leading purchasers to expect that a deed would be recorded, there was in fact no deed to record.

74.     Furthermore, in many cases in which Harbour Victims were charged a recording fee, the Land Contracts were nonetheless not recorded.

75.     The lack of recording has resulted in inconsistent treatment by local authorities, who sometimes treat the transactions like the sale of a home, in which case Harbour Victims are required by local authorities to comply with laws applicable to the sale of a home.   Sometimes local authorities treat the transaction as a landlord/tenant situation, and require Harbour Victims to comply with local laws applicable to rental properties.

76.     The lack of recording also made the tenuous rights of Harbour Victims to their homes even more tenuous, because there is no public record of their Land Contract.   The lack of recording made it possible for Defendants to transfer title to a Harbour Victim's home or grant a mortgage to a Harbour Victim's home to a third party, without disclosing the existence of the Land Contract to the transferee or providing notice to the Harbour Victims, who believed that they held title to their homes.

**Failure to Disclose Defects**

77.     Defendants did not provide the disclosure required by the Pennsylvania Real Estate Disclosure Law, 68 Pa.C.S. Sections 7301-7314.

78.     Given the poor condition of many of the homes,  Defendants' Agents or third parties hired by Defendants' Agents or Defendants would have known and could have conveyed information about defects of the houses in question as part of the disclosure required by such Pennsylvania law, but Defendants chose not to disclose such information.

79.     Defendants did not disclose the existence of building code or other local or municipal code violations that existed at the time of sale.

## VICTIM STORIES

80.     Set forth below are several stories of Harbour Victims who suffered and are suffering as a result of Defendants' unlawful, unfair and deceptive conduct.  The descriptions below are only examples, and the Commonwealth believes and therefore avers that there are many additional Harbour Victims who were harmed by Defendants' acts and practices as described herein.

## VICTIM A

81.     Victim A needed a home for his family after his former wife died suddenly, leaving him with sole custody of their children.  He signed a Land Contract with Defendants in April 2011.

82.     He took over the house in poor condition.  For approximately a year he tried to make it habitable for his family.  They lived in the house at times during that period and at other times lived with a relative or friend while working on major projects at the house.

83.     He ripped out the floors and replaced them, replaced the pipes, extensively repaired

the plumbing, and furnished the house with a new living room set, a new dining room set, three new bedroom sets, a couch, and other personal effects. He also bought a new freezer and a new furnace.

84.    Victim A fell several months behind on his payments to Defendants — he had spent a significant amount of money on costs of working on the house, and was planning to catch up on payments to Defendants as soon as he got his tax refund. Before he had a chance to catch up, he found a padlock on the door of his home. He could not get in, and Defendants would not return his phone calls.

85.    Friends called him shortly thereafter to tell him that they saw that a truck had pulled up to his house. A local company had been hired to remove his personal property from the house. Almost everything was removed and put in the truck. He tried to talk to the company that was hired to remove his property from the house, but they would not give him a phone number or even a name to call to try to get his property back. He tried to contact Defendants to obtain permission to take possession of his personal effects including his tax information, family photographs, his childrens' papers and clothes – but all he could get was an answering machine, and no one ever called him back.

86.    Victim A also lost several thousand dollars' worth of tools that he used professionally in his employment as a heating and air conditioning installer, because they were locked in the house along with the rest of his family's personal property and presumably taken away on the truck that Defendants hired to remove his personal effects.

87.    Victim A was never able to get his personal effects from the house, and the house was sold by Defendants several years later for  less than one thousand dollars.

88.    Victim A never received any legal process or other notice of the existence of legal action against him regarding the property. In fact, the public records reveal no sign of the filing of

any action in ejectment, foreclosure, or other legal proceeding against Victim A in connection with the eviction from the house.

## VICTIM B

89.     Victim B entered into a Land Contract with Defendants in 2015.  Like other of Defendants' victims, she paid a non-refundable deposit and received the written closing documents in the mail thereafter.  She signed the paperwork and sent it back.

90.     Victim B realized, after signing and sending back the paperwork and taking possession of the house, that all the copper pipes had been removed from her house.  She discovered this only after she bought the house because the house had the electricity shut off when she walked through it.

91.     Defendants' Agents assured her that she could have the electricity turned on after she purchased the house.  However, when she had the electricity restored to the house, the lack of copper piping destroyed the hot water heater.  She also had to buy a refrigerator and get the roof replaced.  Even now, there is no functioning furnace in the house, but she is getting by with space heaters.

92.     Victim B is afraid that she is going to lose the house after putting a significant amount of money into her home.  Defendants' Agents have threatened Victim B.  They call her repeatedly when she misses a payment, and are unpleasant, saying things like "How come you can't pay if you have a job?"

93.     Defendants have recently conveyed the deed to Victim B's property to another investment entity, and that group believes that she owes more on the Land Contract than she believes she owes.  She is worried that she will lose the house.

**VICTIM C**

94.    Victim C entered into a Land Contract for property in Philadelphia in 2013.

95.    Victim C paid out of pocket to put a roof on the property, install a heating system, renovate the kitchen, and put down a new tile floor.

96.    Shortly after she and her family moved in, the front of the house starting bulging in an outward direction.   She called Defendants and complained and they said they would fix it but they did not. This situation went on for two years, and got worse and worse.  Victim C paid amounts due under the Land Contract, as her house bulged out more and more.  She would lay in bed at night and hear bricks fall as a result of the sloping caused by the bulging of the front of the house.

97.    Victim C eventually was able to get the bulging on the front of the house repaired with no help from Defendants.

98.    Shortly thereafter, the back of the house began bulging out also.  Gaps in the structure permitted rats to enter her house.  Her dog was bit by a rat.  Rats were in her bathtub. Traumatized, she and her children moved out.  She contacted Defendants, who ultimately agreed to deed the defective property to her.

99.    Without funds to make necessary repairs, Victim C found a buyer who would take the property off her hands for a de minimis amount.  However, the buyer learned that Victim C had obtained from Defendants only a quitclaim deed to the property and refused to close.

100..    At the time that she took the deed from Defendants, she did not understand that a quitclaim deed does not include a warranty of title.  She did not understand that she was not receiving marketable title from Defendants. It is unclear why Defendants gave Victim C a quitclaim deed, since Defendants received special warranty deeds in their transactions with Fannie Mae and Freddie Mac.

101.    Victim C at the present time is not living in the house because the structural problems render it uninhabitable.  She is unable to sell it because she holds only a quitclaim deed from Defendants, and she cannot pay the taxes.  Her credit has been negatively impacted because of the tax liens and negative credit reporting by Defendants.

102.    Victim C believes that Defendants should never have sold the home to her.  She believes that Defendants target low income people.  She believes that Defendants should not have sold her a structurally defective house, and that they knew it was defective.  She also feels cheated because in her "settlement" with them, all they would give her was an unmarketable quitclaim deed to the property.

**VICTIM D**

103.    Victim D entered into a Land Contract with Defendants in 2013.  Like the other Harbour Victims, she viewed the house before purchasing it but it had no electricity, water or gas turned on at the time that she viewed it.

104.    Victim D sent in a non-refundable deposit and was sent a closing package, which she signed, had notarized, and returned.  Victim D does not recall being told that the transaction involved a Land Contract rather than a conventional mortgage before sending in her non-refundable deposit.

105.    Once she took possession, Victim D could see that the house needed repairs.  The pipes were leaking, there was mold in the basement, and electrical repairs were needed.  She paid to get a new electric panel installed and to have several outlets rewired.

106.    Worst of all, however, the house had no water and Victim D could not get water service.  When she tried to get the water turned on, she was told that an inspection was required before water service could commence.  However, the inspector refused to conduct an inspection

because there was a balance due to the water company dating back to a period prior to Victim D's possession of the house. The water company refused to inspect until and unless the overdue balance was paid.

107. Victim D tried to find out how much was owed to the water company, but they refused to answer her questions or provide her any information since she did not own the house.

108. Victim D called Defendants' Agents and asked them to communicate with the water company because the water company would not talk to her as a non-owner. Defendant's Agent said they would "take care of it," but in spite of that promise Defendants' Agents failed to call the water company or even to call Victim D back.

109. For the next 2-3 months, Victim D called Defendants' Agents repeatedly and begged them to call the water company, but they never responded. She left countless voice messages with Defendants' Agents about this water problem, but they never returned her calls or took any action to remedy the problem. And all this time, Victim D was trying to live in a house with no water.

110. Faced with no water in her house, a local water authority that would not talk to her as a non-owner, and the failure of Defendants' Agent to assist with the problem or even to call her back, Victim D had no choice but to abandon the property.

111. Defendants filed an Action in Ejectment against Victim D after she moved out due to the lack of water, and reported her failure to fulfill the Land Contract as a foreclosure to credit reporting agencies, thereby damaging Victim D's credit.

**VICTIM E**

112. Victim E signed a Land Contract in July of 2013. She and her husband knew the home was being purchased "as is." They did not negotiate the price. Victim E did not understand that they did not obtain a deed to the property in connection with the transaction. Victim E knew

21

that they were purchasing the house from the owner of the house, but Victim E thought that they were getting title and a "loan" to purchase the house from the owner.

113.   Victim E initially spent $2,000 getting the furnace and hot water tank repaired. They were told by Defendants' Agent that everything in the house "worked fine" but the pipes were not on because the house had been "winterized." However, once they turned on the water there were problems with the pipes and hot water tank, which they had to repair. They worked on the house and put a significant amount of money into their home, painting, laying title, putting in drywall. Victim E paid all amounts due under the Land Contract and Purchase Money Note on time.

114.   Victim E was panicked upon discovering mold in the house. Victim E told Defendants' Agent about the mold, but Defendants refused to assist in any way. Victim E told Defendants' Agent that they could not afford the extreme cost of remediating the mold.

115.   The Defendants' Agent told Victim E that Victim E could sign a document and be released from any obligations under their Land Contract or Purchase Money Note and that their credit rating would not be affected if they stopped paying under the Land Contract after they signed the document and vacated.

116.   Victim E signed the document proffered by Defendants' Agent, stopped paying under the Land Contract and vacated the property, in approximately September 2017. Victim E is extremely discouraged about all the time and money that was expended on a house rendered uninhabitable by mold.

117.   Victim E was still in the Land Contract in February 2016 when Defendants sold the house to a third party buyer. Victim E was not informed that her house had been sold.

118.    Victim E has been shocked to find that even though they signed the document and never missed a payment before the release document became effective, they have been reported as delinquent to credit reporting agencies with respect to the Land Contract transaction.

**VICTIM F**

119.    Victim F signed a Land Contract with Defendants in early 2013. She agreed to a purchase price, including a non-refundable deposit of $1,000 that she paid prior to receiving the transaction documents. Defendants had purchased the property just a few months prior for approximately 30% of the price they charged Victim F.

120.    Victim F knew the house that she purchased. Several months before Defendants purchased the house from Fannie Mae, it was being marketed by a commercial real estate broker for approximately $14,000 less than Defendants were requiring her to pay. While she was working to get financing to get "the deal to go through," the house was bought by Defendants and the next thing she knew, there was a "for sale by owner" sign in the yard; however, this time, the price of the house was approximately 50% more than the price at which it had been advertised before it was purchased by Defendants.

121.    Victim F nonetheless decided to buy the house from Defendants even though they had raised the price by almost $14,000. However, Victim F did not understand that the nature of the transaction was any different than it would have been if she had purchased the house utilizing a conventional broker and mortgage. She realized it was different, however, quickly after she entered into the Land Contract. She tried to get the taxes and utilities put into her name, but the utility companies and government authorities would not permit her to do so, because the house was not deeded in her name.

122.    The house lacked a gas line, so Victim F had to pay to put in a gas line. She also

had to replace the stove and purchase other appliances. She has also had to fix a leak in the water line and undertake many other repairs.

123.   Victim F has fallen behind in her payments to Defendants several times, and they regularly call and threaten her when she is late. Defendants filed an Action in Ejectment and for the full balance of the purchase price of the property against Victim F in February 2016, but Victim F managed to catch up in her payments and thus has not yet been ejected.

124.   Victim F's house currently requires a new roof. It will cost $8000. She is nervous to put that money into the house, because "they can take it out from under me." She likes the house and "is trying to make it a home." However, she is continuously worried that it will be taken from her.

## VICTIM G

125.   Victim G, who is a disabled veteran, entered into a Land Contract transaction with Defendants approximately four years ago. Because of his unusual work schedule, he and his wife had no choice but to use the combination code given to them by Defendants to enter the house at night in the dark, and they had to view it with a flashlight because the electricity in the house was not on. The house was in "rough shape" when they got it, but they invested thousands of dollars in a new bathroom, fixed a hole in the roof, bought a new heating system, and performed other renovations.

126.   Victim G, who has grown children, wanted to buy a house so that he could have something of value to leave to his children. While he says he knew that he was entering into a "land installment contract" he also said he believes that he has the same rights regarding foreclosure as anyone with a mortgage.

127.    Although Victim G thinks that he has the same rights regarding foreclosure as anyone with a mortgage, he does not have the same rights regarding foreclosure as anyone with a mortgage.  And although Victim G believes that he is building equity in the house for his children to inherit, he is not building equity for his children to inherit unless he is able to remain alive until the end of the 30 year term of his Land Contract.

128.    His payments on the Land Contract are withdrawn directly and automatically each month from his disability payments.  He is not late with any payments, as a result.  He is eager to refinance with a different lender, but unfortunately Defendants are not recording his positive payment history with credit reporting agencies.  Therefore, he has been unable to build up his credit rating to enable him to refinance.  He has asked them "six times" to report his positive payment history but they have refused.

**VICTIM H**

129.    Victim H bought her house almost five years ago from Defendants.  Her process of entering into a Land Contract was very similar to the typical process described above.  "There wasn't a whole lot of explanation" about the documents or what they meant, and she did not understand the fundamental differences between her Land Contract and a conventional mortgage at the time she entered into the Land Contract.  In fact, she noted that "to this day I have never seen a real live person" in connection with her transactions with Defendants.  She was a first-time home owner and did not understand the extent of problems with the house when she entered into the Land Contract.  It took her an entire year of repairs before it was even possible to live there.  She had no idea this would be the case when she signed the Land Contract documents.

130.     The utilities were not on when she initially viewed the house.  She found out after she bought it that copper pipes had been ripped out of her house.  Furthermore, the gas and electric companies made her do "a lot of expensive work" before they would turn on the gas and electricity.

131.     Victim H also had to pay the water company a substantial sum owed by the prior occupant of the house before the company would turn on the water.

132.     Victim H's current anxiety is that she has been trying to build up her credit rating so that she can refinance or move to a new house.  Her payments to Defendants are timely.  However, Defendants are not reporting her positive payment history to credit reporting agencies, so she is not able build up her credit rating.

**VICTIM I**

133.     Victim I has been in a Land Contract with Defendants for two years.  He believes that he overpaid for the house and that Defendants initially agreed to pay the taxes on the house.  However, after a year they increased the amount of his Land Contract payment (he incorrectly refers to it as mortgage) to cover the cost of the taxes.  There is much confusion with the water bill, because a copy is sent to both Defendants and Victim I.

134.     Victim I also experienced local inspectors visiting his home after he signed the Land Contract.  They said because he did not own the home, but was living in it, they had to do an "occupancy inspection" and as a result they required him to put in fire alarms and perform other repairs.

135.     Victim I spends all his free time working on the house.  He "gutted it" and has put in a new boiler, new radiators, a new water heater, and new flooring.  He is fearful that Defendants will take his house away and that he and his family will lose the value of all the improvements that he has made to it.

## COUNT I

## DEFENDANTS' DECEPTIVE AND UNFAIR PRACTICES IN CONNECTION WITH THE SALE OF FAMILY HOMES VIOLATE THE CONSUMER PROTECTION LAW

136.  The preceding paragraphs are incorporated herein as though fully set forth below.

137.  As described above, among other deceptive and unfair behaviors, Defendants:

   a.  collected a non-refundable deposit from Harbour Victims before providing the transaction documents containing (buried within a collection of conventional mortgage documents) the unusual, unconscionable, unfair, and unfavorable terms of the Land Contract documents;

   b.  Used "for sale by owner" signs, primarily conventional mortgage documents under a "Congratulations on your decision to purchase a home!" cover letter, and minimal buyer-seller contact to mislead and deceive Harbour Victims into believing that the risky and unusual Land Contract transactions were similar to and as safe as typical conventional mortgage transactions;

   c.  Limited potential buyers' opportunity to evaluate homes, typically providing walk through opportunities without electricity, gas, and/or water service, and withheld information about defects in the properties;

   d.  Withheld from Harbour Victims the fact that the price the Harbour Victims were being charged for the house was often 300% to 400% or more of the price Defendants recently paid for the house in exactly the same condition;

   e.  Did not meaningfully inform Harbour Victims that, contrary to explicit and implicit misrepresentations made by Defendants, the Land Contract

27

documents presented by Defendants for signature (after collecting a sizeable non-refundable deposit) deprived Harbour Victims of the ability to realize equity appreciation in the property unless Harbour Victims performed without fail for 30 years;

f.   Did not meaningfully explain that the Land Contract documents provided no cure rights or legal protections included in and associated with conventional mortgage transactions;

g.   In some cases collected a $75 or $80 fee for "recording" of Land Contracts but willfully failed to record such Land Contracts; and

h.   Otherwise engaged in predatory, opportunistic and unconscionable behavior designed to mislead consumers about the nature of the underlying transaction and condition of the property.

138.   By engaging in such unfair and deceptive acts and practices, and others described herein, Defendants violated Section 201-3 of the Consumer Protection Law, as defined by Section 201-2 of said law, including without limitation:

a.   Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

b.   Section 201-2(4)(iii) by causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another;

c.   Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

d.   Section 201-2(4)(ix), by advertising goods or services with intent not to sell them as advertised; and

28

e. Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-3 and § 201-2(4), (ii), (iii), (v), (ix) and (xxi).

139.   The above described conduct has been willful and is unlawful under Section 201-3 of the Consumer Protection Law, 73 P.S. § 201-3.

## COUNT II

## DEFENDANTS' LAND CONTRACTS DID NOT INCLUDE PROVISIONS REQUIRED UNDER THE INSTALLMENT LAND CONTRACT LAW

140.   The preceding paragraphs are incorporated herein as though fully set forth below.

141.   The Land Contracts and the transactions contemplated thereby are subject to the Installment Land Contract Law, which defines an "Installment Land Contract" as "[E]very executory contract for the purchase and sale of a dwelling . . . whereby the purchaser is obligated to make six or more installment payments to the seller after the execution of the contract and before the time appointed for the conveyance of title to the dwelling." 68 P.S. Section 903(a)(1).

142.   The Installment Land Contract Law requires that Sections 3,4,5,6,7,8 and 9 of such law be included in every Installment Land Contract.  None of such sections was included in the Land Contracts.

143.   For example, Section 4 of the Installment Land Contract Law requires that the land contract include a requirement that seller send notice by registered or certified mail in the event of a default, specify the nature of the default, and provide a period of no less than 30 days following service to make payment.   Only a few of Defendants' Pennsylvania Land Contracts contain very limited cure rights, and the vast majority of them contain no cure rights.

144.    By way of another example, Section 5 of the Installment Land Contract Law requires that recovery for breach of a land contract shall be limited to all installments and assessments for public improvements due prior to the surrender of the premises by purchaser, among other things. In particular, Section 5 states expressly that the unpaid balance of the purchase price shall not be considered an item of recoverable damages.   Nonetheless, the Purchase Money Note used by Defendants permitted the recovery of the entire unpaid balance of the purchase price upon a Harbour Victim's default, in direct violation of Section 5.

145.    By way of another example, Section 6 of the Installment Land Contract Law provides important protections for purchasers to recover amounts paid on account of principal in excess of 25% of the purchaser price, in the event that purchaser voluntarily surrenders possession of the premises. Not only do the Land Contracts fail to provide for this important right of purchasers as required by the Installment Land Contract Law, they provide the opposite – that purchasers who voluntarily surrender possession have no right to recover any amounts previously paid under the Land Contract.  And even worse, the Purchase Money Note permits seller to demand the entire unpaid balance of the full purchase price from Harbour Victims upon any default, including upon buyer's voluntary departure from the property.

146.    By way of another example, Section 7 of the Installment Land Contract Law requires that seller's title be good and marketable during the entire term of the contract, and provides for certain rights of the purchaser in the event that seller does not maintain good and marketable title. The Land Contracts did not contain any mention of these rights that are required to be included in the Land Contracts, and in fact certain forms of Land Contract provide the opposite – they permit Defendants to convey only title that is significantly less than good and marketable.   The Land

Contracts require in some cases for Defendants to deliver only a quitclaim deed and others require, if not a special or limited warranty deed, "such other deed that is available."

147.    In addition, certain Harbour Victims, such as Victim A, have been ejected from their homes and suffered termination of their Land Contracts without the process required by the Installment Land Contract Law.

148.    Defendants have violated the Installment Land Contract Law as set forth above, and by virtue of such violation have violated Section 201-3 of the Consumer Protection Law, including without limitation:

       a.    Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

       b.    Section 201-2(4)(iii) by causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another;

       c.    Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

       d.    Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

       73 P.S. § 201-3 and § 201-2(4), (ii), (iii), (v), and (xxi).

149.    The above described conduct has been willful and is unlawful under Section 201-3 of the Consumer Protection Law, 73 P.S. § 201-3.

COUNT III

**THE INTEREST RATE CHARGED TO HARBOUR VICTIMS VIOLATES THE LOAN INTEREST AND PROTECTION LAW, AND DEFENDANTS HAVE OTHERWISE VIOLATED SUCH LAW AND THE CONSUMER PROTECTION LAW**

150.    The preceding paragraphs are incorporated herein as though fully set forth below.

151.    Article 3, Section 301 of the Loan Interest and Protection Law provides for a flexible maximum lawful interest rate for residential mortgages, based upon the Monthly Index of Long Term United States Government Bond Yields, plus an additional two and one-half percent per annum.

152.    The transaction contemplated by the Land Contracts is a "residential mortgage" as defined in the Loan Interest and Protection Law.  In particular, "residential mortgage" is defined as an obligation to pay a sum of money in an original bona fide principal amount of the base figure or less, evidenced by a security document and secured by a lien upon, among other things, a single family home located within the Commonwealth.  The "base figure" means $217,873 as adjusted annually by the Commonwealth for inflation.

153.    Section 7.2 of Chapter 7 of the Pennsylvania Code clarifies that "security document" for the purposes of the Loan Interest and Protection Law is deemed to include, among other things, "an installment land contract."

154.    It is settled Pennsylvania law that an installment land contract will be deemed to be "secured by a lien upon real property" for purposes of the Loan Interest and Protection Law.

155.    From 2010 until 2016, the applicable maximum interest rate for residential mortgages under Section 301 ranged from a high of 6.5% to a low of 4.5%.[1]

---

[1] http://www.dobs.pa.gov/For%20Media/Pages/Act-6-Information.aspx

156.    Defendants violated Article 3, Section 301 of the Loan Interest and Protection Law by charging an interest rate during this period that was typically 9.9% per annum, approximately double the maximum allowable rate under Pennsylvania law.

157.    For example, Victims A through I were charged 9.9% (or in at least one case, 10%) interest under their Land Contract and/or Purchase Money Notes; however, the maximum lawful rate under the Loan Interest and Protection Law at the time of each of their transactions was as follows:

Victim A – 6.50%

Victim B – 4.75%

Victim C -- 4.50%

Victim D –5.75%

Victim E – 5.00%

Victim F – 4.50%

Victim G – 5.50%

Victim H – 5.75%

Victim I – 5.25%

158.    Article 3, Sections 403 and 404 of the Loan Interest and Protection Law require that before a residential mortgage lender may accelerate the maturity of any residential mortgage obligation, or take other specified legal action, such person shall give the residential mortgage debtor notice of its intent at least thirty days in advance, in accordance with the requirements of that section, by registered or certified mail.  Section 404 provides certain cure rights.

159.    The Land Contracts did not include such provisions relating to notice of intent to take legal action and right to cure a default, nor did Defendants provide such notice or rights to Harbour Victims, in violation of Section 403 and 404 of the Loan Interest and Protection Law.

160.    The Attorney General has standing to bring a civil action for injunctive relief and such other relief as may be appropriate to secure compliance with the Loan Interest and Protection Law.  41 P.S. Section 506.

161.    Defendants have violated the Loan Interest and Protection Law by charging Harbour Victims, including Victims A through I, an unlawful rate of interest.

162.    Defendants have also violated the Loan Interest and Protection Law by failing to afford Harbour Victims, such as Victim A, the rights required to be afforded to Harbour Victims pursuant to Sections 403 and 404 of the Loan Interest and Protection Law.

163.    Defendants have violated the Loan Interest and Protection Law as set forth above, and by virtue of such violations have thereby also violated Section 201-3 of the Consumer Protection Law, including without limitation:

   a.   Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

   b.   Section 201-2(4)(iii) by causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another;

   c.   Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

   d.   Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-3 and § 201-2(4), (ii), (iii), (v), and (xxi).

164.    The above described conduct has been willful and is unlawful under Section 201-3 of the Consumer Protection Law, 73 P.S. § 201-3.

## COUNT IV

## DEFENDANTS VIOLATED THE MORTGAGE LICENSING ACT BY FAILING TO BE LICENSED AS REQUIRED UNDER THAT ACT

165.    The preceding paragraphs are incorporated herein as though fully set forth below.

166.    The Mortgage Licensing Act requires that no person shall engage in the mortgage loan business in the Commonwealth without being licensed as a mortgage broker, mortgage lender, mortgage loan correspondent or mortgage originator.  7 Pa.C.S. Section 6111.

167.    The "mortgage loan business" is defined as the business of advertising, causing to be advertised, soliciting, negotiating or arranging in the ordinary course of business or offering to make or making mortgage loans, and a "mortgage loan" is defined as a first or secondary mortgage loan, or both a lease-purchase agreement or a mortgage modification, as the context may require.  7 Pa.C.S. Section 6102.

168.    Defendants engaged in the "mortgage loan business" without the required license.

169.    Defendants have violated the Mortgage Licensing Act as set forth above, and by virtue of such violation have violated Section 201-3 of the Consumer Protection Law, including without limitation:

   a. Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

b.  Section 201-2(4)(iii) by causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another;

c.  Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; and

d.  Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-3 and § 201-2(4), (ii), (iii), (v), and (xxi).

170.  The above described conduct has been willful and is unlawful under Section 201-3 of the Consumer Protection Law, 73 P.S. § 201-3.

## COUNT V

## DEFENDANTS FAILED TO DELIVER THE DISCLOSURE REQUIRED BY THE REAL ESTATE SELLER DISCLOSURE LAW

171.  The preceding paragraphs are incorporated herein as though fully set forth below.

172.  Section 7303 of the Real Estate Seller Disclosure Law requires that any seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement which satisfies the requirements of Section 7304 of such law.

173.  A signed and dated copy of the property disclosure statement must be delivered to the buyer in accordance with Section 7305 prior to the signing of an agreement of transfer by the seller and buyer with respect to the property.

174.  Defendants did not comply with the requirements of Section 7303 of the Real Estate Seller Disclosure Law with respect to substantially all of the Land Contract transactions effected by Defendants in Pennsylvania.

175.    Failure to comply with the requirements of Section 7303 is a violation of the Real

Estate Seller Disclosure Law and by virtue of such violation Defendants have violated Section 201-

3 of the Consumer Protection Law, including without limitation:

    a.    Section 201-2(4)(ii), by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

    b.    Section 201-2(4)(iii) by causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by another;

    c.    Section 201-2(4)(v), by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; and

    d.    Section 201-2(4)(xxi), by engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

    73 P.S. § 201-3 and § 201-2(4), (ii), (iii), (v), and (xxi).

176.    The above described conduct has been willful and is unlawful under Section 201-3

of the Consumer Protection Law, 73 P.S. § 201-3.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to issue

an Order:

    A.    Declaring Defendants' conduct, as set forth in Counts I, II, III, IV, and V to be in violation of the Consumer Protection Law;

    B.    Directing Defendants to comply with the Consumer Protection Law;

    C.    Directing Defendants, pursuant to Section 201-4.1 of the Consumer Protection Law, to make full restitution to all consumers who have suffered losses as a result

of the acts and practices alleged in Counts I, II, III, IV, and V, and any other acts or practices which violate the Consumer Protection Law, including both Harbour Victims who are current parties to Land Contracts and Harbour Victims who have been but are no longer parties to Land Contracts;

D.   Directing Defendants, pursuant to Section 201-8 (b) of the Consumer Protection Law, to pay maximum civil penalties as permitted thereunder;

E.   Providing for such other injunctive relief as is permitted by the Consumer Protection Law as necessary to correct and ameliorate the effects of the unfair and unlawful behavior described herein, which injunctive relief would include, without limitation, directing Defendants to comply with the Mortgage Licensing Act, the Installment Land Contract Law, and the Real Estate Seller Disclosure Law;

F.   Declaring Defendants' conduct, as set forth in Count III, in violation of the Loan Interest and Protection Law;

G.   Providing for such injunctive relief and other relief as permitted by Section 506 of the Loan Interest and Protection Law as necessary to correct and ameliorate the effects of the unfair and unlawful behavior described herein; and

H.   Granting such other relief as the Court deems necessary and appropriate.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

Date: July 18, 2018

By: _____

Susan A. Apel
Attorney No. 50597
Senior Deputy Attorney General
Office of Attorney General
Bureau of Consumer Protection
1251 Waterfront Place
Mezzanine Level
Pittsburgh, Pennsylvania 15222
(412) 565-2578

38

# EXHIBIT A

## PURCHASER'S INFORMATION
### Please complete and sign below.

PROPERTY ADDRESS: ▓▓▓▓▓▓▓▓▓▓▓

Account No.: ▓▓▓▓▓▓

YOUR INFORMATION:

NAME: ▓▓▓▓▓▓▓

TELEPHONE: ▓▓▓▓▓▓ (HOME) _____ (WORK)

_____ (CELL) EMAIL: _____

SOCIAL SECURITY NUMBER: ▓▓▓▓▓▓▓   DATE OF BIRTH: ▓▓▓▓▓

OCCUPATION: ▓▓▓▓▓

EMPLOYER: ▓▓▓▓▓▓▓▓

LENGTH OF EMPLOYMENT: ▓▓▓   INCOME: ▓▓▓▓▓▓

PRESENT ADDRESS: ▓▓▓

MARITAL STATUS: MARRIED ✔   SINGLE ___   DIVORCED ___   SEPARATED ___

ARE CHILDREN TO RESIDE IN RESIDENCE? YES ___   NO ✔

IF YES, THEIR AGES: ___ ___ ___ ___

OTHER INCOME: _____ (SSI; RETIREMENT; DISABILITY; UNEMPLOYMENT; CHILD SUPPORT; ETC)

TOTAL HOUSEHOLD INCOME: ▓▓▓▓

**************************************************************************

RELATIVE TO CONTACT IN CASE OF EMERGENCY (NOT LIVING WITH YOU):

NAME: ▓▓▓▓▓▓▓▓

COMPLETE ADDRESS: ▓▓▓▓▓▓▓▓

TELEPHONE: _____

**************************************************************************

SPOUSE'S / PARTNER'S INFORMATION:

NAME: ▓▓▓▓▓ (HOME, IF DIFFERENT) _____ (WORK)

TELEPHONE: ▓▓▓▓   DATE OF BIRTH: ▓▓▓▓

SOCIAL SECURITY NUMBER: ▓▓▓▓▓▓   OCCUPATION: ▓▓▓▓

EMPLOYER: ▓▓▓▓▓

LENGTH OF EMPLOYMENT: ▓▓▓▓   INCOME: ▓▓▓▓▓▓

SIGNATURE: ▓▓▓▓▓▓ Date   ▓▓▓▓▓▓▓ Date

Rev. 4.5.13



## PURCHASER'S INFORMATION
### Please complete and sign below.

PROPERTY ADDRESS: ████████████████████████████

Account No.: ████

YOUR INFORMATION:

NAME: ████████████████   ████████████ (WORK)

TELEPHONE: (HOME) ████   (CELL) EMAIL: ████   DATE OF BIRTH: ████

SOCIAL SECURITY NUMBER: ████████████   OCCUPATION: ████

EMPLOYER: ████████████   INCOME: ████

LENGTH OF EMPLOYMENT: ████

PRESENT ADDRESS: ████

MARTIAL STATUS: MARRIED ✓   SINGLE ___   DIVORCED ___   SEPARATED ___

ARE CHILDREN TO RESIDE IN RESIDENCE?   YES ___   NO ✓

IF YES, THEIR AGES: ___   ___   ___   ___

OTHER INCOME: _____ (SSI; RETIREMENT; DISABILITY; UNEMPLOYMENT; CHILD SUPPORT; ETC)

TOTAL HOUSEHOLD INCOME: ████

*****************************************************************

RELATIVE TO CONTACT IN CASE OF EMERGENCY (NOT LIVING WITH YOU):

NAME: ████████████████

COMPLETE ADDRESS: ████████████

TELEPHONE: ████

*****************************************************************

SPOUSE'S / PARTNER'S INFORMATION:

NAME: ████████

TELEPHONE: ████ (HOME, IF DIFFERENT) ____ (WORK)

SOCIAL SECURITY NUMBER: ████   DATE OF BIRTH: ████

EMPLOYER: ████   OCCUPATION: ████

LENGTH OF EMPLOYMENT: ████   INCOME: ████

SIGNATURE: ████████   Date ____   ████████   ████   Date

Rev. 4.3.13

## REFERENCE INFORMATION
### (PLEASE COMPLETE ALL INFORMATION BELOW)

PROPERTY ADDRESS: ███████████████████████████     Account

No.: ████████

REFERENCES:  You must provide three personal references who have known you for at least three years.  At least one of them should be a relative, not living with you.  All references must be completed in full.  Do not include individuals who live with you (example: spouse) or anyone under the age of 21.

NAME: ████████████████

PERMANENT ADDRESS: ███████████████████

CITY, STATE, ZIP CODE: ██████████

TELEPHONE: ███████████

TELEPHONE NUMBER: ( )_____          ALTERNATE NUMBER ( )_____

RELATIONSHIP TO BORROWER: █████████████

NAME: ████████████

PERMANENT ADDRESS: ██████████

CITY, STATE, ZIP CODE: ███████████

TELEPHONE: ███████████

TELEPHONE NUMBER: ( )_____          ALTERNATE NUMBER ( )_____

RELATIONSHIP TO BORROWER: █████████

NAME: ███████

PERMANENT ADDRESS: ██████████

CITY, STATE, ZIP CODE: █████████

TELEPHONE: █████████

TELEPHONE NUMBER: ( )_____          ALTERNATE NUMBER ( )_____

RELATIONSHIP TO BORROWER: ████████

Rev. 4.5.13



## Purchasers' Certification and Authorization

### CERTIFICATION

The Undersigned certify the following:

1. I/We have applied to purchase a house with financing from Harbour Portfolio VIII, LP. In applying for the purchase of this property, I/We completed an application containing various information on the purpose of the mortgage, the amount and source of the down payment, employment and income information, and the assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the mortgage application or other documents, nor did I/We omit any pertinent information.

2. I/We understand and agree that Harbour Portfolio VIII, LP reserves the right to change the application review process to a full documentation program. This may include verifying the information provided on the application with the employer and/or financial institution.

3. I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this purchase, as applicable under the provisions of Title 18, United States Code, and Section 1014.

4. The Purchaser also agrees that Harbour Portfolio VIII, LP has the right to sell his/her/their agreement or mortgage to another party.

### AUTHORIZATION TO RELEASE INFORMATION

To Whom It May Concern:

1. I/We have applied to purchase a house with financing from Harbour Portfolio VIII, LP, as part of the application process, Harbour Portfolio VIII, LP, and its representatives, agents or assigns ("Owner"), may verify information contained in my/our application and in other documents required in connection with the purchase, either before the purchase is closed or as part of its quality control program.

2. I/We authorize Owner to provide to Harbour Portfolio VIII, LP and any entity to whom Harbour Portfolio VIII, LP may sell, transfer or assign my mortgage or contract, any and all information and documentation that they may reasonably request. Such information includes, but is not limited to, applicants' employment history and income; bank, money market and similar account balance; credit history; and copies of income tax returns.

3. Harbour Portfolio VIII, LP or anyone that purchases the mortgage or contract may address this authorization to any party named on the application.

4. I/We give Owner permission to review any credit history prior to this contract.

5. A copy of this authorization may be accepted as an original.



SS# _____

Rev. 4.5.13



Harbour Portfolio VIII, LP
PO Box 1996
Irmo, SC 29063

Acct #: █████

TO:    ████████████

FROM:  ██████

RE:    Payment Options    ████████████

DATE:  ████████████

Because we value you as a new customer, we want to assist you in fulfilling your agreement; which not only includes your monthly house payment but also includes property taxes. We have based your monthly tax holding payment on an estimate based on previous years' taxes. We understand that it can be difficult to pay these taxes in one lump sum. Therefore, we would like to assist you in paying your property taxes by including a monthly tax holding payment with each of your monthly house payments. Based on your property tax estimate, your monthly tax holding payment would be $███ each month, beginning ████████.

**Monthly payment including tax payment:**
Current monthly payment      $ ████
Tax Holding portion          $ ████
HOA Dues                     $ ████
_____
Total payment                ████  Due on the 15th

I agree to a monthly payment of $██████ due the 15th of each month.

████████████          ████████████████
              date                        date

████  Please be advised that if you default on your land contract, you forfeit all tax holding
INITIALS  payments.

*Please sign, date, initial and return to our office within five (5) business days. We are here to assist you, please feel free to call with any questions, (803) 750-1196*

REV. 8.4.11



## OWNER OCCUPANT CERTIFICATION
### Rider to the Real Estate Purchase Addendum

Property Address 

This is to certify that I am purchasing the above-referenced property as my primary residence and I will occupy, establish and use the above-referenced property as my primary residence within 60 days after the Closing for at least one year after the date of occupancy, unless extenuating circumstances arise which are beyond my control. I further certify that I will not sell or rent the property within twelve (12) months of the Closing. Furthermore, I fully understand that Seller is relying upon my representation of being an owner occupant of the property, and that the sale of the property to me by Seller is conditioned upon this representation.

_____          _____
                                    Date

_____          _____
                                    Date

Agent certifies that he/she has not knowingly submitted to Seller the sales contract on behalf of an investor purchaser.

_____          _____
SELLING (BUYER'S) AGENT              Date

Rev. 4.5.13



(RHLS d726984 Originating Writer Leech)

Acct # ____

## EQUAL CREDIT OPPORTUNITY ACT

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this company is the Office of the Comptroller of the Currency, Customer Assistance Group, 1301 McKinney Street, Suite 3710, Houston, Texas 77010.

We are required to disclose to you that you need not disclose income from alimony, child support or separate maintenance payment if you choose not to do so.

Having made this disclosure to you, we are permitted to inquire if any of the income shown on your application is derived from such a source and to consider the likelihood of consistent payment as we do with any income on which you are relying to qualify for the loan for which you are applying.

## FAIR CREDIT REPORTING ACT

An investigation will be made as to the credit standing of all individuals seeking credit in this application. The nature and scope of any investigation will be furnished to you upon written request made within a reasonable period of time. In the event of credit denial due to an unfavorable consumer report, you will be advised of the identity of the Consumer Reporting Agency making such report and of your right to request within (60) sixty days the reason for the adverse action, pursuant to provisions of section 615 (b) of the Fair Credit Reporting Act.



Date

SS#



Date

SS#

(803) 731-8444 Fax
Acct #

(803) 750-1196 Office

NMLS

**Harbour Portfolio VIII, LP**
**PO Box 1996**
**Irmo, SC 29063**
March 28, 2014

RE: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dear ▓▓▓▓▓▓▓▓▓▓

## AFFIDAVIT OF OCCUPANCY

Please place a check mark by the appropriate statement:

(1) __✓__ You have purchased the above referenced property to occupy as your primary residence and certify that you plan to occupy the property for a period of not less than 1 year from the date of closing.

(2) _____ You have purchased the above referenced property as investment property and plan to lease it to an outside party.

(3) _____ You have purchased the above referenced property as investment property and plan to restore and resell.

(4) _____ You have purchased the above referenced property as investment property and have already arranged to lease it to an outside party.

(5) _____ You have purchased the above referenced property with other intentions than those which are listed here. Intention: _____

## ANTI-COERCION STATEMENT

The insurance laws of this state provide that the lender may not require the applicant to take insurance through any particular insurance agent or company to protect the mortgaged property. The applicant, subjected to the rules adopted by the Insurance Commissioner, has the right to have the insurance placed with an insurance agent or company of his choice, provided the company meets the requirement of the lender. The lender has the right to designate reasonable financial requirements as to the company and the adequacy of the coverage. I have read the foregoing statement, or the rules of the Insurance Commissioner relative hereto, and understand my rights and privileges and those of the lender relative to the placing of such insurance.

   

Date                           Date

YOU Hereby AGREE TO NOTIFY OUR OFFICE, when you initially lease the property or when the occupancy status of the property changes, i.e. tenants vacates, lease expires, etc.

   

Date                           Date

Prepared By:
Harbour Portfolio VIII, LP
P.O. Box 1995
Irmo, SC 29063
(803) 798-4555

Contract Expiration : ███████
If payments are made in accordance
with the terms of this Agreement.

## AGREEMENT FOR DEED
### (Land Contract)

Acct # ███████

### CONTRACT SUBJECT TO ARBITRATION

*THIS AGREEMENT FOR DEED* is entered into on this ███ day of ███████
between Harbour Portfolio VIII, LP hereafter known as the "Seller" and ███████
hereafter known as the "Purchaser". Current Address: ███████

*WITNESSETH* that if Purchaser shall first make the payments and perform the covenant(s)
hereafter described:

1. *SELLER* hereby covenant(s) and agree(s) to convey and assure to the Purchaser and
his/hers/their heirs, executors, administrators or assigns, in fee simple, clear of all encumbrances,
by a good and sufficient deed, the lot and piece of land, situated at: ███████ the State of PA and
███ in the County of: ███████ the city of ███████
further known and described as follows, to-wit:

### SEE Attachment "A" FOR LEGAL DESCRIPTION OF PROPERTY

2. *PURCHASER* hereby covenant(s) and agree(s) to pay to the Seller the sum of ███████
Dollars and no/cents, ($ ███████ ) in the manner as follows: ███████
Dollars and no/cents, ($ ███ );

### THIS DOWN PAYMENT IS NON-REFUNDABLE ███████ ; (initial) ███████

has been paid (prior to the release of this contract) on ███████ and the remaining ███████
███████ Dollars and no cents ($ ███████ ) shall be paid according to the terms
of a "Promissory Note" of even date with interest at the rate of Nine And 90/100 percent (9.9%)
per annum, payable monthly on the whole sum remaining from time to time unpaid;

3. *AND TO PAY ALL TAXES, assessments or impositions that may be legally levied or
imposed upon said land and improvements and/or personal property as of the date of this
Agreement for Deed (Land Contract).*

4. *AND TO KEEP THE BUILDINGS UPON SAID PREMISES INSURED BY SOME
COMPANY SATISFACTORY TO THE SELLER,* and payable to the parties, respectively as
their interest may appear in the sum not less than ███████ Dollars and
no/cents ($ ███████ ) during the term of this agreement.

5. *AND IF ANY TAXES, INSURANCE OR OTHER ASSESSMENTS* are not paid then this
agreement is in *default,* and *at the option of the Seller,* the seller can pay said taxes, insurance or
other assessments and add the payments made plus up to *50%* of that payment as penalty to
the principal balance due.

6. *THE SALE OF THE PROPERTY* (and the term "Property") shall include all buildings and improvements on the property and all rights, title and interest of Seller in and to adjacent streets, roads, alleys and rights-of-way, but no mineral interests.

*IT IS MUTUALLY AGREED*, by and between the parties hereto, that the Seller transfers the said property to the Purchaser in strictly *"AS IS"* condition without any condition disclosure statement. ▢▢ (initial)

and the *Purchaser(s)* are solely responsible for bringing the building and premises to a habitable condition within a reasonable period of time not exceeding *Four months* (4), and maintaining the property in good state of repairs during the term of this agreement. Purchaser(s) may request an extension from the Seller by contacting prior to the four months deadline. *The purchaser(s) agrees to keep the premises neat and orderly and not conduct or allow to be conducted any illegal or offensive activities which might constitute a nuisance.*

7. *AND IN CASE OF FAILURE OF THE PURCHASER* to make any of the payments or any part thereof, or to perform any of the covenants hereby made and entered into, or transfer of any ownership interest in this "Agreement" by Purchaser, this contract, *at the option of the Seller*, may be forfeited and terminated, and the Purchaser shall forfeit all payments made by him/her/them on this contract; and such payments may be retained by the Seller in full satisfaction and liquidation of all damages sustained by them, and the premises aforesaid without being liable to any action therefore. And if agreement is placed with an attorney or other agent for collection by suit or otherwise due to default, Purchaser(s) will pay; on demand, any of said fees and related expenses that the Seller incurs. ▢▢ (initial)

8. *CONVERSION TO "MONTH TO MONTH"* TENANCY; upon the Seller exercising its right of termination as provided herein, all rights and interest hereby created and then existing in the Purchaser and in all claiming Lender(s), the Purchaser shall wholly cease and terminate, and the Purchaser shall be deemed a "month to month" tenant. The Purchaser now known as " the Purchaser shall be deemed a "month to month" tenant. The Purchaser now known as " Tenant", agrees to surrender the said property to the Seller without demand, peaceful possession of said property in as good condition as it is now, Reasonable wear and tear alone accepted within thirty (30) days after notice of termination. After termination by the Seller pursuant to this paragraph; ▢▢ (initial)

9. *THE PURCHASER SHALL* then pay rent in an amount equal to the principal and the interest payment, in addition to any other agreed upon monthly assessments stated herein and the Purchaser acknowledges that the Seller can initiate an action to evict the Purchaser immediately. In the event the Purchaser neglects or refuses to surrender such possession it shall be lawful for the Seller to enter upon and take possession of the said property without notice and remove all persons and their personal property. Seller may, at their own option, cause a written declaration to be recorded in the office of the Clerk of Court of ▢ County, to evidence the existence of his/hers/theirs election to terminate all rights hereunder in accordance herewith. Such declaration when so recorded shall be, as to all subsequent Purchasers or Tenants or encumbrances of the property or any part thereof, conclusive proof of default by the Purchaser and the Seller election to terminate all rights in the said property existing by reason of this agreement. All moneys paid by the Purchaser and all improvements constructed in or upon the said property shall be retained by the Seller as compensation for the use and occupancy thereof by the Purchaser, consideration for the execution of this Agreement and liquidation damages to the Seller for such default. The Seller in the event of default by the Purchaser, and both Parties hereto agree that these forfeitures are reasonable and are not intended as a penalty. ▢ (initial)

10. *THE PURCHASER ACKNOWLEDGES* that upon termination of this agreement by the Seller and Purchaser becomes a "month to month" tenant with a monthly rent equal to ▢ Dollars And ▢/100 ($▢).

11. *IT IS MUTUALLY AGREED*, by and between the Parties hereto, that the time of each payment is essential part of this contract and that all covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of respective parties. *At the option of the Seller, Purchaser* further agrees to convert these

documents to a <u>Deed and Mortgage</u> and provide the seller updated financial information. *And it is further understood that the Deed will exclude any and all mineral interests.* The purchaser also agrees that the seller has the right to sale his/her/their agreement or mortgage to another party.

*ARBITRATION: ANY dispute between these parties shall be decided by an arbitrator to be chosen by the parties or if the parties' cannot agree on an arbitrator, them assigned by a court of competent jurisdiction, and such arbitration is mandatory and the judgment of the arbitrator shall be final and will be entered as judgment in a court of law of competent jurisdiction. The parties expressly and knowingly waive their right to a jury trial. Arbitration does not apply to eviction and or foreclosure.*

*VENUE AND JURISDICTION: IN THE event that any suit or claim may arise concerning this contract or the obligation there under the suit or claim shall be brought in Lexington County, state of South Carolina, and the parties agree to waive any and all objections they or it may have to such venue or personal or subject matter jurisdiction or Forum non conveniens  and agree further to be bound and governed by South Carolina law.*

(SELLERS' SIGNATURE)

*IN WITNESS WHEREOF,* the Parties to these present have hereunto set their hands and seals the day and year first written above.

Harbour Portfolio ▓▓▓▓

By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Attorney-In-Fact

Witness
Print Name: ▓▓▓

Witness
Print Name: ▓▓▓

STATE OF SOUTH CAROLINA      )

COUNTY OF LEXINGTON          )                    ACKNOWLEDGMENT

    I, the undersigned, a Notary Public, do hereby certify that ▓▓▓▓▓▓ Attorney-In-Fact for Harbour Portfolio VIII, LP, the seller, herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

SWORN and subscribed before me on this ▓▓▓ day of ▓▓▓

Notary's Signature
Notary Public for the State of South Carolina
My Commission Expires: ▓▓▓▓▓ (Seal)

(PURCHASER SIGNATURES)
(Accp █████

Witness ████████████
Print Name: █████████████

Witness
Print Name: ██████████

STATE OF _Pa_____                    )
                                     )          ACKNOWLEDGEMENT
COUNTY OF _____                  )

    I, the undersigned, a Notary Public, do hereby certify that the purchaser, ████████
_____ herein appeared before me this day and acknowledged the due
execution of the foregoing instrument.

SWORN and subscribed before me on this
_____ day of _____
████████████████
Notary's Signature)
Notary Public for the State of _Pa___
My Commission Expires: _____ (Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
_____ Notary Public
_____ County
My Commission Expires _____

Acct # ███

# *PURCHASE MONEY NOTE*



███ Day of ███            $ ███

*FOR VALUE RECEIVED*, the undersigned promises to pay to the order of Harbour Portfolio VIII, LP or its assigns:

SEND PAYMENT TO:    National Asset Advisors, LLC
                    P.O. Box 1996
                    Irmo, SC 29063

*THE PRINCIPAL SUM* of ███████ Dollars and no/cents ($ ███ ) as follows:

*BEARING INTEREST* at the rate of Nine And 90/100 percent (9.9%) per annum from date hereof in monthly installments of ███████ Dollars And 67/100 ($ ███ each payment beginning the 15th day of each month beginning on  each payment shall be applied first to any late fees or other fees associated with this promissory note, then the accrued interest will be calculated from payment to payment on the unpaid principal balance at the rate of Nine And 90/100 percent (9.9%) the remainder thereof to the unpaid principal balance, and the entire remaining unpaid principal balance together with accrued interest to date shall become due and payable in full on the ███ day of ███ in the year ███ **All payments not received on or before the 25ᵗʰ of the month will be subject to a 10% late fee.** If a check is returned for ANY REASON a charge of $ 30.00 will be applied.

*THIS NOTE*, is secured by an "AGREEMENT FOR DEED" on the following property:

Address: ███████
City, State, Zip: ███████
County: ███            Tax Map: # ███

*THE PURCHASER ALSO AGREES* that the seller has the right to sale his/her/their agreement or mortgage to another party.

*IT IS SPECIFICALLY AGREED* that the makers hereof shall have the right of prepayment at any time without the penalty of additional interest so long as accrued interest on the unpaid principal is paid as herein provided.

*AND THAT UPON FAILURE* to make the payment or any part thereof, at the time when due, then the unpaid principal balance hereof plus interest shall, at the option of the holder of this note, at once becomes due and payable.

**If this note is placed in the hands of an attorney for collection by suit or otherwise, I/We will pay, on demand, any attorney's fees and related expenses that the holder of this note incurs.**

*ALL PARTIES HERETO*, makers, endorsers, sureties, Guarantors, or otherwise, severally waive protest, demand, presentment and notice of dishonor and the holder may grant extensions of the time of payment of this note, or a part thereof, without any release of liability as to parties secondarily liable, who hereby waive notice, as to such extension, and against whom recourse is, in such event, expressly reserved.

(PURCHASER SIGNATURES)
(Acct # ▮▮▮▮▮)



Witness
Print Name:

Witness
Print Name:

STATE OF ___Pa___ )
                   )
COUNTY OF ___▮▮▮___ )

ACKNOWLEDGEMENT

   I, the undersigned, a Notary Public, do hereby certify that the purchaser, ▮▮▮▮▮
_____, herein appeared before me this day and acknowledged the due
execution of the foregoing instrument.

SWORN and subscribed before me on this
___▮▮▮___ day of ___▮▮▮▮▮___

Notary's Signature
Notary Public for the State of ___Pa___
My commission expires: ▮▮▮▮▮ (Seal)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
▮▮▮▮▮, Notary Public
▮▮▮▮▮ County
My Commission Expires ▮▮▮▮▮

## ATTACHMENT "A" -- LEGAL DESCRIPTION

*THIS AGREEMENT* is secured by the property listed below between Harbour Portfolio VIII, LP, and ███████████████████

Street Address: ███████████████████████

Description:

All that certain parcel of land situate in the Township of ████████ County of ████████ Commonwealth of Pennsylvania, being more particularly described as follows: Beginning at a point on the ██████████████████████ and in line of lands of Lot No. ████████ being the property now or formerly of ████████████████ thence along said Road, ███████ degrees █████ to a point; thence in a line ████ to a point in line No. ████ now or formerly the property of ████████████████ feet to a point in line of of Lot No. ████ thence along Lot No. ████ the aforesaid Lot No. ████; thence along Lot No. ████ to a point, the place of beginning. It being Lot No. ████ as shown on ... ████████████████ prepared for Property Address is: ██████████████████████

TMS: # ████████

Initial ████ ████

*Acct #* ███

## "CERTIFICATION"

*I/WE, THE PURCHASER*, hereby certify that I/We have been informed by the Seller that it is advisable when entering into an "Agreement for Deed" for real estate to obtain legal advice from an attorney. I/We the Purchaser have decided not to consult an attorney and I/We have made that decision outside the presence of the Seller. I/We further certify this "Certification" *was signed* outside the presence of Seller.

███████████████

Witness
Print Name: ███

███████████████

Witness
Print Name: ███

STATE OF ___Pa___          )
                            )          · ACKNOWLEDGEMENT
COUNTY OF ███               )

    I, the undersigned, a Notary Public, do hereby certify that the purchaser, ███ herein appeared before me this day and acknowledged the due execution of the foregoing instrument.

SWORN and subscribed before me on this ███ day of ███ , ███

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Notary Public
County
My Commission Expires ███

███████████████

Notary's Signature

Notary Public for the State of ___Pa___
My Commission expires: ███ (Seal)

Acct # ▮

## *LEAD BASED PAINT RIDER*

*RIDER TO THE "AGREEMENT FOR DEED"* dated the ▮ day of ▮ between the *Purchaser* and *Seller* for the property located at: ▮ in the County of ▮ State of PA

*SELLER AND THE PURCHASER AGREE* that the following additions and/or modifications are hereby made to the above referenced Contract:

1 – *AGREEMENT FOR DEED CONTINGENCY.* Pursuant to Federal Regulations, the provisions of this Rider must be satisfied before the Purchaser are obligated under this Agreement for Deed.

2 – *LEAD WARNING STATEMENT.* The Seller, as owners of an interest in residential real property of which a residential dwelling was built prior to 1978, are notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities; reduce intelligence quotient, behavioral problems, and impairing memory. Lead poisoning also poses a particular risk to pregnant women. The Seller, as owners of an interest in the residential real property, are required to provide any Purchaser with whom the Seller enter into an Agreement for Deed with any information on lead-based paint hazards from risk assessments or inspections in the possession of the Seller and notify the Purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

3 – *LEAD HAZARD INFORMATION PAMPHLET.* Seller shall deliver to the Purchaser an EPA approved lead hazard information pamphlet (For example, Protect Your Family From Lead In Your Home). Intact lead-based that is in good condition is not necessarily a hazard.

4 – *SELLER'S DISCLOSURE.* (Check all applicable boxes)

  (A) Presence of Lead-Based Paint and/or Lead Based Paint Hazards.   (Check either (1) or (2) below)

___ (1) *Hazards Known.* Attached hereto is a statement signed by Seller disclosing the presence of known lead-based paint and /or lead-based hazards at the Property, including but not limited to the basis of the determination that lead-based paint and /or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards and the condition of the painted surfaces.

X (2) *Hazards Unknown.* Seller has no actual knowledge of the presence of lead-based and/or lead-based paint hazards at the property.

  (B) Records and reports available to Seller.   (Check either (1) or (2) below)

___ (1) *Records Provided.* The following is a list of all records and/or reports available to the Seller pertaining to lead-based paint and/or lead-based paint hazards at the property.

X (2) *No Records.* The Seller has no records or reports pertaining to lead-based paint hazard risk assessment or inspection.

5 – *RISK ASSESSMENT.*

Acct

## (INITIAL either (A) OR (B) below)

(A) *PURCHASER* hereby waive/waives the opportunity to conduct a lead-based paint hazard risk assessment or inspection.

(B) *THIS CONTRACT IS CONTINGENT* upon a risk assessment or inspection of the Property for the presence of lead-based paint and/or lead-based paint hazards being obtained by the Purchaser at the expense of the Purchaser before 5:00 pm on the tenth calendar day after full execution of the Contract by all parties (the "Lead Paint Inspection Period"). If the results of such inspection are unacceptable to the Purchaser for any reason whatsoever, the Purchaser shall notify the Seller of the attorney of the Seller in writing within two business days after the end of the Lead Paint Inspection Period, together with a copy of the inspection and/or risk assessment report in such case, either party may cancel the Contract upon written notice to the other party or the other party's attorney. A copy of such notice(s) should be delivered to the real estate brokers. If the notice of unacceptable results by the Purchaser's is not received by the Seller or the attorney of the Seller within two business days after the end of the Lead Paint Inspection Period, this Inspection contingency is deemed waived by the Purchaser. The definitions in Paragraph 1.B and C of Form 1.1 Contract Rider (1995) shall be used to determine whether or not the notice of unacceptable results by the Purchaser has/have been received by the Seller before the end of the Lead Paint Inspection Period. The Seller will cooperate with the Inspection made by the Purchaser in such fashion as may be reasonably requested by the Purchaser. The Purchaser may remove this contingency at any time without cause.

*6—ACKNOWLEDGEMENT BY THE PURCHASER.*

## (INITIAL AND DATE EACH OF THE FOLLOWING)

Initial        Date

 PURCHASER HAS/HAVE received copies of all information, records and/or reports set forth in Paragraph 4 of this Rider or attached to this contract.

 PURCHASER HAS/HAVE received an EPA approved lead hazard information pamphlet.

PURCHASER HAS/HAVE received a 10-day opportunity (or mutual agreed upon period) or has/have waived the opportunity to conduct a risk assessment or inspection for the presence of and/or lead-based paint hazards.

*7—CERTIFICATION OF ACCURACY.* The undersigned have reviewed the information above and certify to the best of their knowledge, that the statement they have provided is true and accurate.

████████████████████████

Acct # ██████

## *MOLD DISCLOSURE*

*Print Name(s) of Seller:* Harbour Portfolio VIII, LP

*Print Name(s) of Buyer:* ██████████████████

*Property Address:* ████████████████████████████

1. *Seller Disclosure.* To the best of Sellers' actual knowledge, Sellers represent:
   A. The Property described herein ____ has XX has not been previously tested for molds.
   If answer to (A) is "has not," then skip (B) and (C) and go to Section 2.
   If answer to (A) is "has" then complete (B) and (C).
   B. The molds found ____ were ____ were not identified as toxic molds.
   C. With regards to any molds that were found, measures ____ were ____ were not taken to remove those molds.

2. *Mold Inspections.* Molds, funguses, mildew and similar organisms may exist in the Property of which the Seller is unaware and has no actual knowledge. These contaminants generally grow in places where there is excessive moisture, such as where leakage may have occurred in roofs, pipes, walls and plant pots , or where there has been flooding. A professional home inspection may not disclose molds. Buyer, may wish to obtain an inspection specifically for molds to more fully determine the condition of the Property and its environmental status. Neither Sellers' agent nor Buyers' agents are experts in the field of mold. The Buyers are strongly encouraged to satisfy themselves as to the Property condition.

*Buyers' Initials:* ████ ████

3. *Hold Harmless.* Buyers make the decision to purchase the Property independent of any representation of the Agents, Brokers or Attorneys involved in the transaction regarding mold. Accordingly, Buyers agree to indemnify and hold

   _____

   . (print names of Brokers, Designated Agents and Attorneys) harmless in the event any mold is present on the Property.

4. *Receipt of Copy.* Sellers and Buyers have read this Mold Disclosure, and by their signatures hereon acknowledge receipt of a copy thereof.

5. *Professional Advice.* Sellers and Buyers execute this Disclosure with the understanding that they should consult with a professional of their choice regarding any questions or concerns before its execution.

BUYER(S)                                    SELLER(S): Harbour Portfolio VIII, LP

████████████████████                    ████████████████ Attorney-In-Fact

████████████████████

## Addendum to Agreement for Deed
### Acct# ▮▮▮▮▮▮

It is agreed upon by Harbour Portfolio VIII, LP (Seller) and ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Purchaser(s) that the Seller agrees to the following:

Upon fulfillment of Agreement for Deed (Account # ▮▮▮▮ Buyer is aware of No Water Rights to the property at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ will be transferred at that time subject to any current lease or leases

Date: ▮▮▮▮▮▮▮                     Purchaser: ▮▮▮▮▮▮▮▮▮▮

Date: ▮▮▮▮▮▮                      Purchaser: ▮▮▮▮▮▮▮▮

(Notary signature for Purchaser(s))

▮▮▮▮▮▮▮▮▮▮▮▮
Notary: ▮▮▮▮▮▮▮▮
State of: Pa
Commission Expires: ▮▮▮▮▮▮

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
▮▮▮▮▮▮ Notary Public
▮▮▮▮▮▮ County
My Commission Expires Jan. 7, 2018

Harbour Portfolio VIII, LP

Date: ▮▮▮▮▮▮                      Seller: ▮▮▮▮▮▮▮▮▮
                                          Attorney-in-Fact

NOTARY PUBLIC

(Notary signature for Seller)

▮▮▮▮▮▮▮▮▮▮▮
Notary: ▮
State of: ▮▮▮▮▮▮
Commission Expires: ▮▮▮▮▮▮

**TRUTH-IN-LENDING DISCLOSURE STATEMENT**
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Seller:    Harbour Portfolio VIII, LP
Acct No.:  ▮▮▮▮▮▮
Purchaser(s): ▮▮▮▮▮▮▮▮
Address:   ▮▮▮▮▮▮▮▮

Date: ▮▮▮▮▮▮

Contract Sales Price:  $▮▮▮▮▮

Property Address: ▮▮▮▮▮▮▮▮▮▮

| | Initial Disclosure estimated at time of application | [ X ] | Final Disclosure on contract terms |
|---|---|---|---|

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf as of closing. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 9.900% | $ ▮▮▮▮ | ▮▮▮▮▮ | $ ▮▮▮▮ |

[ X ]   REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.

YOUR PAYMENT SCHEDULE WILL BE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING | | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|---|
| ▮▮▮ | $ ▮▮▮ | ▮▮▮▮ | | | | |

* Excludes taxes, hazard or flood or mortgage insurance.

| | DEMAND FEATURE:  This purchase transaction has a demand feature. |
|---|---|

| | VARIABLE RATE FEATURE:  Your purchase contains a Variable Rate Feature.  Disclosure about the Variable Rate Feature have been provided to you earlier. |
|---|---|

SECURITY INTEREST:  You are giving a security interest in:
(X) the goods or property being purchased.  () real property you already own.

FILING OR RECORDING FEES $

LATE CHARGE: If payment is received ten (10) days after the due date, a late charge of 10% of the payment will be due. If a check is returned for NSF there will be a charge of $30.00.

PREPAYMENT:  If you pay off your account early, you
0 may     (x) will not        have to pay a penalty
0 may     (X) will not        be entitled to a refund of part of the finance charge already paid.

INSURANCE:    Credit life, accident, health or loss of income insurance is not required in connection with this purchase.
This purchase transaction requires the following insurance:
(X) Hazard Insurance        0 Flood Insurance        0 Private Mortgage Insurance
0 Mutual Mortgage Insurance
Borrower(s) may obtain insurance through any person of his/her choice, provided said carrier meets the requirements of the Lender.

ASSUMPTION:   Someone buying your house
0 may    0 may, subject to conditions,    (X) may not assume the remainder of your purchase on the original terms

See your contract documents for additional information regarding nonpayment, default, right to accelerate the maturity of the obligation, prepayment rebates and penalties, and the Lender's policy regarding assumption of the obligation.
0 all dates and numerical disclosures except late payment disclosure are estimates.  means an estimate

*The undersigned hereby acknowledge receiving and reading a completed copy of this disclosure along with copies of the documents provided.  The delivery and signing of this disclosure does not constitute an obligation on the part of the Seller to make, or the Purchaser(s) to accept, the account as identified ▮▮▮▮
Read, acknowledged and accepted this _____ day of ▮▮▮▮▮▮ 20▮▮

▮▮▮▮▮▮▮▮                              ▮▮▮▮▮▮▮▮
(Purchaser)                            (Purchaser)

**A. Settlement Statement**

U.S. Department of Housing and Urban Development

NULS *Remove* Computer *Remove*

**B. Type of Loan**

| 1. | ☐ FHA | 2. | ☐ FmHA | 3. | ☐ Conv. Unis. |
| 4. | ☐ VA | 5. | ☐ Conv. Ins. |

| 6. File Number | 7. Loan Number | 8. Mortgage Insurance case number |

**C.** NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in totals.

**D.** Name and address of Purchaser(s):

**E.** Name and address of seller:   Harbour Portfolio VIII, LP
P.O. Box 1998, Irmo, SC 29063

**F.** Name and address of lender:   National Asset Advisors, LLC
4350 St. Andrews Rd, Suite G, Columbia, SC 29210

**G.** Property location:

**H.** Settlement agent:   Harbour Portfolio VIII, LP
Place of settlement   4350 St. Andrews Rd, Suite G, Columbia, SC 29210

**I.** Settlement date:

| J. SUMMARY OF Purchaser's TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM Purchaser** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to Purchaser (line 1400) | | 403. Settlement charges to Seller (line 1400) | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments for items paid by seller in advance* | | *Adjustments for items paid by seller in advance* | |
| 106. Cy/Tn Tx       to | | 406. Cy/Tn Tx       to | |
| 107. Co Tx       to | | 407. Co Tx       to | |
| 108. Assess       to | | 408. Assess       to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM Purchaser** | | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF Purchaser:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Owner Financed Mortgage | | 504. Payoff of first mortgage loan | |
| 205. Second Mortgage | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposit or earnest money | |
| 207. | | 507. Owner Financed Mortgage | |
| 208. | | 508. Second Mortgage | |
| 209. | | 509. | |
| *Adjustments for items unpaid by seller* | | *Adjustments for items unpaid seller* | |
| 210. Cy/Tn Tx       to | | 510. Cy/Tn Tx       to | |
| 211. Co Tx       to | | 511. Co Tx       to | |
| 212. Assess       to | | 512. Assess       to | |
| 213. Revenue Stamps | | 513. Revenue Stamps | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR Purchaser** | | **520. TOTAL REDUCTION AMOUNT DUE TO SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO Purchaser** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amount due from Purchaser (line 120) | | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for Purchaser (line 220) | | 602. Less reductions in amt due to seller (line 520) | |
| 303. CASH ( X FROM) ( TO) Purchaser | | 603. CASH ( X TO) ( FROM) SELLER | |

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained here in important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on Line 401 above constitutes the Gross Proceeds of this transaction.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

| TIN# | Buyer(s): | | Harbour Portfolio VIII, LP | Seller |
| | Buyer(s): | | Attorney-In-Fact | |

| | | | Division of commission | PAID FROM PURCHASER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| 700. TOTAL REAL ESTATE BROKER FEES | | | (line 700) as follows: | | |
| price $ | @ | %=$ | | | |
| 701. $ | | to | | | |
| 702. $ | | to | | | |
| 703. Commision paid at Settlement | | | | $ ▮▮▮▮ | |
| 704. Application and Processing Fee | | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | $ ▮▮▮▮ |
| 801. Loan origination fee ▮▮▮▮ | | % | | | |
| 802. Loan discount | | % | | | |
| 803. Appraisal fee | | to | | | |
| 804. Credit report | | to | | | |
| 805. Lender's Inspection fee | | | | | |
| 806. Mortgage Insurance application fee to | | | | | |
| 807. Assumption fee | | | | | |
| 808. Application and Processing Fee | | | | | |
| 809. | | | | | |
| 810. | | | | | |
| 811. | | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID ADVANCE** | | | | | |
| 901. Interest from | | to | @$ | /day | |
| 902. Mortgage Insurance premium for | | | months to | | |
| 903. Hazard Insurance premium for | | | years to | | |
| 904. | | | years to | | |
| 905. | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001. Hazard Insurance | | months @ $ | per month | | |
| 1002. Mortgage Insurance | | months @ $ | per month | | |
| 1003. City property taxes | | months @ $ | per month | | |
| 1004. County property taxes | | months @ $ | per month | | |
| 1005. Annual assessments | | months @ $ | per month | | |
| 1006. | | months @ $ | per month | | |
| 1007. | | months @ $ | per month | | |
| 1008. | | months @ $ | per month | | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement or closing fee | | to | | | |
| 1102. Abstract or title search | | to | | | |
| 1103. Title examination | | to | | | |
| 1104. Title Insurance binder | | to | | | |
| 1105. Document preparation | | to | | | |
| 1106. Notary fees | | to | | | |
| (includes above items numbers) | | | | | |
| 1108. Title Insurance $ | | to | | | |
| (includes above items numbers) | | | | | |
| 1109. Lender's coverage | | $ | | | |
| 1110. Owner's coverage | | $ | | | |
| 1111. Tax Certificate Fee | | | | | |
| 1112. Administration Fee | | $ | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording fees; Deed $ | ;Deed of Trust $ | ;Releases $ | | $ ▮▮▮▮ | |
| 1202. City/county tax/stamps: Deed $ | | ;Mortgage $ | | | |
| 1203. State tax/stamps: Deed $ | | ;Mortgage $ | | | |
| 1204. Security Agreement (Mobile Home) | | | | | |
| 1205. | | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey to | | | | | |
| 1302. Pest Inspection to | | | | | |
| 1303. Hazard Insurance | | | | | |
| 1305. | | | | | |
| 1400. TOTAL SETTLEMENT CHARGES (enter on lines 103, Section J and 502, Section K) | | | | $ ▮▮▮▮ | $ ▮▮▮▮ |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Purchaser: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Purchaser: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Seller:   Harbour Portfolio VIII, LP
          Attorney-In-Fact

caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent                    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and 1010.

## LOAN TERMS:

| | |
|---|---|
| Purchaser: | ▉▉▉▉▉ |
| Account Number: | ▉▉▉▉▉ |
| Your initial loan amount is | $▉▉▉ |
| Your Loan terms is (# of months) | ▉▉ |
| Your initial interest rate is | Percentage:  9.900% |
| Payment amount | $▉▉▉ |
| Your initial monthly amount owed for principal, interest, and any other Mortgage insurance is | Includes:<br>[X] Principal<br>[X] Interest<br>[ ] Mortgage Insurance |
| Can your interest rate rise? | [X] No    [ ] Yes, it can rise to maximum of _____ %. The first change will be on _____ and can change again every _____ after _____. Every change date, your interest rate can increase or decrease by _____%. Over the life of the loan. Your interest rate is guaranteed to never be lower than _____ % or higher than _____%. |
| Even if you make payments on time, can your loan balance rise? | [X] No    [ ] Yes, it can rise to a maximum of $_____ |
| Even if you make payments on time, can your monthly amount owed for principal, interest rise? | [X] No    [ ] Yes, the first increase can be on _____ and the monthly amount owed can rise to $_____. The Maximum it can ever rise to is    $_____ |
| Does your loan have a prepayment penalty? | [X] No    [ ] Yes, your maximum prepayment penalty is $_____ |
| Does your loan have a balloon payment? | [X] No    [ ] Yes, you have a balloon payment of $_____ due in _____ years on _____ |
| Total monthly amount owed including escrow account payments | [ ] You do not have a monthly escrow payment for items, such as property taxes, and homeowner's insurance. You must pay these items directly yourself.<br><br>[X] You have an additional monthly escrow payment of $▉▉▉. Which also includes HOA dues of $▉▉▉ That results in a total initial monthly amount owed of $▉▉▉ This includes principal, interest, and any items checked below:<br><br>[X] Property Taxes          [ ] homeowner's insurance<br>[X] HOA Fees                 [ ] Utilities (water only Toledo) |

Date ▉▉▉▉▉▉

Note: If you have any questions about the Settlement Charges and loan Terms listed on this form, please contact the contract dept.

(Revised 04/01)

## GOOD FAITH ESTIMATE

Applicant(s):

Property Address:

Application No:

Prepared By:  Harbour Portfolio VIII, LP
P.O. Box 1996
Imo, SC 29083

Date Prepared:

This information provided below reflects estimates of the charges which you are likely to incur at the settlement of your Acct. The fees listed are estimates - actual charges may be more or less. Your transactions may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Acct Amount $  $_____  Interest Rate: _____  9.90 % Term: _____ months

| | | |
|---|---|---|
| **800.  ITEMS PAYABLE IN CONFLICTION WITH Acct** | | |
| 801.  PM Note Origination Fee | | $0.00 |
| 802.  PM Note Discount | | $0.00 |
| 803.  Appraisal Fee | | $0.00 |
| 804.  Credit Report | | $0.00 |
| 805.  Lender's Inspection Fee | | $0.00 |
| 806.  Mortgage Broker Fee | | $0.00 |
| 807.  Tax Related Service Fee | | $0.00 |
| 808.  Application and Processing Fee | | $___ |
| 809.  Underwriting Fee | | $0.00 |
| 810.  Wire Transfer Fee | | $0.00 |
| 811.  Administration Fee | | $0.00 |
| 812. | | |
| | | |
| **900.  ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | |
| 901.  Interest for _____ days @ $ _____ | per day | |
| 902.  Mortgage Insurance Premium | | |
| 903.  Hazard Insurance Premium | | |
| 904.  Tax and Assessment | | |
| 905.  VA Funding Fee | | |
| | | |
| **1000.  RESERVES DEPOSITED WITH LENDER:** | | |
| 1001.  Hazard Insurance Premium | months @ $ | per month |
| 1002.  Mortgage Ins. Premium Reserves | months @ $ | per month |
| 1004.  Taxes and Assessment Reserve | months @ $ | per month |
| | | |
| **1100.  TITLE CHARGES:** | | |
| 1101.  Closing or Escrow Fee | | |
| 1105.  Document Preparation Fee | | |
| 1106.  Notary Fees | | |
| 1107.  Attorney Fees | | |
| 1108.  Title Insurance | | |
| | | |
| **1200.  GOVERNMENT RECORDING & TRANSFER CHARGES:** | | |
| 1201.  Recording Fees | | $___ |
| 1202.  City/County Tax/Stamps | | |
| 1203.  State Tax/Stamps | | |
| | | |
| **1300.  ADDITIONAL SETTLEMENT CHARGES:** | | |
| 1302.  Pest Inspection | | |
| 1303.  Hazard Insurance | | |
| | | |
| **TOTAL ESTIMATED SETTLEMENT CHARGES:** | | |
| **COMPENSATION TO BROKER (Not Paid Out of Acct Proceeds):** | | |
| Remax | | $0.00 |

| **TOTAL ESTIMATED FUNDS NEEDED TO CLOSE:** | | **TOTAL ESTIMATED MONTHLY PAYMENT:** | |
|---|---|---|---|
| Purchase Price/Payoff | $___ | Principal & Interest | $___ |
| Acct Amount | $___ | Other Financing (P & I) | $0.00 |
| Est. Closing Costs | $___ | Hazard Insurance | $0.00 |
| Est. Prepaid Items/Reserv | $0.00 | Real Estate Tax Monthly Payment | $___ |
| Amount Paid by Seller | $___ | Mortgage Insurance | $0.00 |
| | | Homeowners Assn. Dues | $___ |
| | | Water (Toledo Only) | $0.00 |
| **Total Est. Funds Needed to Close** | $___ | **Total Monthly Payment** | $___ |

This Good Faith Estimate is being provided by National Asset Advisors, LLC and no lender has been utilized.

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA).



Date



Date

**IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA :
ACTING BY ATTORNEY GENERAL :
JOSH SHAPIRO :
 :
     Plaintiff, :
 :
     v. :
 :
HARBOUR PORTFOLIO CAPITAL, LLC,
HARBOUR PORTFOLIO GP, LP, :
HARBOUR PORTFOLIO VI, L.P., :
HARBOUR PORTFOLIO VII, L.P., :
HARBOUR PORTFOLIO VIII, L.P., :
HARBOUR PORTFOLIO ADVISORS LLC, :
AND CHARLES A. VOSE III, :
 :
     Defendants. :

## VERIFICATION

  I, Laura J. Ukmata being duly sworn according to law, hereby state that I am an Agent with

the Commonwealth of Pennsylvania, Office of Attorney General, Bureau of Consumer Protection,

Pittsburgh Regional Office, that I am authorized to make this verification on behalf of the Plaintiff

and that the facts in the foregoing Complaint are true and correct to the best of my knowledge or

information and belief.

              _____
              Laura J. Ukmata
              Senior Consumer Protection Agent

CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents, differently than non-confidential information and documents.

Submitted by: _Susan A. Apel_

Signature: _S. A. Apel_

Name: _Susan A. Apel_

Attorney No. (if applicable) _50597_